# UNITED STATES DISTRICT COURT

## for the

## District of Massachusetts

**Camille Tuason Mata,**
*Plaintiff*

    **v.**

**University of Massachusetts-Amherst,**
**Jeremy Forgue, Allison Lepper, Laura Shea,**
*Defendants*

CASE NO. _____

JURY TRIAL : **NO**

## COMPLAINT FOR A CIVIL CASE

**I.**    **Parties to this Complaint**

    A.  Plaintiff

> Camille Tuason Mata
> 184 Plumtree Road
> Sunderland, Franklin County
> MA. 01375
> (413) 259-7323
> cmata@umass.edu

    B.  Defendants

      Defendant No. 1    Jeremy Forgue
                        H.R. Executive Director, Administrative and Finance
                        181 Presidents Drive, 330 Administrative Building
                        Amherst, Hampshire County
                        Massachusetts 01003
                        (413) 545-1581
                        jmforgue@umass.edu

      Defendant No. 2    University of Massachusetts
                        181 Presidents Drive
                        Amherst, Hampshire County

1

|  | Massachusetts 01003<br>(413) 545-1581 |
|---|---|
| Defendant No. 3 | Allison Lepper<br>Associate Counsel<br>100 Venture Way, Ste. 5<br>Hadley, Hampshire County<br>Massachusetts 01035<br>(413) 545-2204<br>alepper@umass.edu |
| Defendant No. 4 | Laura Shea<br>Legal Administrative Specialist<br>100 Venture Way<br>Hadley, Hampshire County<br>Massachusetts 01035<br>(413) 545-2204<br>lshea@umass.edu |

## II.    Basis for Jurisdiction

This Complaint raises a Federal Question, pursuant to Title 28 U.S.C. §1331. The provisions of the United States Constitution at issue in this case are:

- Title VII of the Civil Rights Act of 1964, specifically, 42 U.S.C. Section 2000e-2000-17.

- Civil Rights Act of 1991.

The State Constitutional provision at issue in this case is:

- Massachusetts General Laws 151B.

Jurisdiction is based on 28 U.S.C. §1343. This Court has further jurisdiction over the original action under 29 C.F.R §1614.407(d) and the Equal Employment Opportunity Act of 1972.

Equitable and other relief are sought under 42 U.S.C. 2000e(5)(g).

## III.   Statement of Claim

This civil action is presently being filed with the U.S. District Court of Massachusetts (Western Division)  because more than 180 days has passed since the Notice of Appeal and the

2

supporting Appellant Brief were filed on June 20, 2024, and on July 16, 2024, respectively, (please refer to Appendix II, pp. 049-052; pp. 057-060), albeit with no acknowledgement of the Notice of Appeal or response to the Supporting Brief from the E.E.O.C Office of Federal Appeals. The discrimination complaint is based on the original action filed with the Equal Employment Opportunity Commission in Boston, Massachusetts (E.E.O.C Charge No. 523-2024-01858). The details of the employment discrimination Claim are described below.

On February 29, 2024, I filed an employment discrimination complaint against the University of Massachusetts at Amherst ("Defendant University") with the Massachusetts E.E.O.C (Boston) on the grounds of sex/gender, race, and ethnic origin (Appendix I, pp. 003-395; Appendix II, pp. 0). Despite my qualifications, skills, and work experiences, I was not granted an interview and consequently not selected for hire for seven advertised positions. Due to the time limitations curtailing the Complaint process, I could challenge Defendant University's decision on only three positions: (1) Clerk V/Department of Finance and Administration, (2) Academic Advisor/Graduate and Professional Programs, and (3) Senior Survey and Evaluation Analyst. (Refer to Appendix II, pp. 023-027. See Appendix I, p. 001 for USPS receipt).

I am a Philippine-born woman, naturalized into United States citizenship in May 1985 with graduate and undergraduate qualifications and a compendium of technical, quantitative, and analytical skills. I earned a B.A in Political Science from Defendant University, UMass-Amherst, a Master of Urban and Regional Planning from the University of Hawai'i at Manoa in Honolulu, Hawai'i, a Master of Social Change and Development from the University of Wollongong in New South Wales, Australia, and a Master of Arts with a concentration in Environmental Studies from Goddard College in Plainfield, Vermont. I have also written clean, first drafts of key chapters of my dissertation as partial completion of a Ph.D. program at the University of Auckland in

3

Auckland, New Zealand. I have published the two case studies of my M.U.R.P thesis in student urban planning journals (M.I.T Student Planning Journal, U.T. Austin Student Planning Journal), my entire Goddard College M.A. thesis into an academic monograph with the University Press of America (U.P.A), and my analyses of additional urban planning issues in domestic and international journals. I have also peer-reviewed a special issue in the Journal of Public Affairs. Along the way, I acquired software skills in Arc.G.I.S, Microsoft Suite, S.P.S.S, Qualtrics, and received training in research methods, namely statistics, economics, qualitative data collection, and the literature review. I have written reports relevant to projects at hand, demonstrating my written communication skills. I have applied my systems analysis trainings to internships in San Francisco (Land-banking intern) and Oakland (Research intern) in California, to an Environmental Justice Coordinator position in New Orleans, Louisiana, and to a town planning advisory position in Chipata District, Zambia. I have worked in educational settings both in the United States (summer camp counselor and tutor) and in Japan (Assistant English Teacher). In addition, I have worked as a legislative advocate, in fundraising, in customer service settings, and in grounds/landscaping.

The state E.E.O.C complaint was triggered by several observations I had made of disparate treatment between me and other current and/or past employees who had been hired by Defendant University, indicating a pattern of discriminatory behavior towards me that has barred me from rising into a higher-paying position, which utilized my graduate and undergraduate education and gamut of skills. One of the important observations was that Defendant University had consistently elected to not hire me for positions that called for some, if not many, of the skills I had acquired, developed, and honed over the years from professional experiences and from related, relevant coursework. In situations in which I might exhibit deficiencies, I would be able to enroll in relevant

courses, if necessary, because Defendant University offers courses that are helpful to building the workplace capacities of any of its employees. Given my proven ability to learn new skills and to synthesize knowledge, I was confident that I could adapt my abilities to any relevant position.

After reviewing the contents of my UMass Amherst "Employment" account in January 2023, I realized that I had applied for seven open call positions between 2022 and 2023 (Appendix I, pp. 049-050), all of which sought the education and the skills that I possessed and were either directly applicable or transferable to each respective open call position. Although my E.E.O.C complaint only listed the three most recent positions, I observed persistent discrimination across all of the seven positions to which I had applied. Specifically, I applied for a Clerk V position in the Department of Finance and Administration on November 19, 2023, and was notified sometime in January 2024 that I was "not selected for hire" (See Appendix II in Appellant Brief, p. 049, under "Submitted Applications: Clerk V . . ."). This position required knowledge of payroll, in particular, compensation time, overtime, holiday pay, wage levels – essentially anything related to payroll for the employees of Defendant University. As one of these employees, I have experience in reviewing my bi-weekly paycheck stubs for errors. The payroll clerks currently employed in positions similar to the Clerk V position at Defendant University often do not explain to me the reasons for errors whenever I sight them, or explain the correct policy in relation to wage compensation.

On September 14, 2023, I applied for the Academic Advisor of Graduate and Professional Programs. In addition to software skills, this position entailed knowledge of the graduation requirements of graduate and professional programs and provided guidance on, for instance, how to optimize each student's educational experience with domestic and global internship opportunities or with career fairs sponsored by different departments. I have successfully navigated through and graduated from each of my higher education programs. One of my graduate degrees

was earned from an international higher education institution, the University of Wollongong. This experience would have enabled me to understand the challenges that international students might face and, therefore, be able to address their concerns. Moreover, due to my having completed four higher education degrees, including at Defendant University, I am quite aware of the course requirements needed to complete any program. My education experiences also give me insight into the sentiments that graduate and professional students might harbor. Defendant University did not hire me for this position.

On August 29, 2023, I applied for the Senior Survey and Evaluation Analyst, which called for skills in statistical and other data analysis, as well as the ability to interpret pertinent data. This position also called for academic writing skills. I have experience as well as graduate training in research. I have conducted literature reviews, developed social surveys, questionnaires, and interview questions. As such, I have experience in primary data collection, in utilizing large data sets, such as the U.S. Census and those of U.N. organizations. I have analyzed social science data, interpreted them, and written my findings in reports and publications. These publications are listed on my resume and on my Linkedin.com professional profile. Many of these publications could be verified on-line by doing a Google search. Defendant University did not hire me for the Senior Survey and Evaluation Analyst position.

On February 7, 2023, I applied for the Director of Human Resources - College of Education, a position that was responsible for the day-to-day operations of the College of Education, the designation of staff responsibilities, support the academic needs of its faculty and students, support the administrative needs of its operational and academic staff, foresee the professional needs of all of its students, and possibly suggest workshops essential for building on students' research preparation and employment search and preparation skills. My international education experience,

indicating my ability to interact and work with international students, my knowledge of adaptive systems similar to H.R. operations, my leadership trainings, my knowledge of the tutoring program, Boltwood, at the College of Education, in which I took part when I was an undergraduate student at Defendant University, all contribute to what I anticipated to be a successful transition into a leadership role. In this position, I would also be able to initiate workshops that support undergraduate and graduate student learning.

On July 21, 2022, I applied for the Education Abroad Advisor for Custom Programs - IPO. This position entailed knowledge of the study abroad program, procedure for emergency situations for students studying abroad, and how coursework could be integrated into the student's major and/or general education requirements for graduation. Such knowledge could be acquired through the orientation and onboarding activities of the International Program Office. Emergency services, such as evacuations, could only be coordinated through the collaboration of the overseas host institutions. There would be a proper procedure for carrying out emergencies. I have also gathered information from those who had studied abroad when I was an undergraduate, with respect to the integration of study abroad credits into the student's graduate requirements. The study abroad students' international coursework do not factor into the G.P.A (Grade Point Average), but could be used for graduation credits. This might have changed since I graduated from Defendant University in 1992. I already have such knowledge without having worked as an education abroad advisor. Furthermore, as one who has studied and earned a graduate degree overseas, I am familiar with the challenges of socio-cultural adaptation in new surroundings, assignment standards, and would be able to impart some advice for pre-departure students.

On March 22, 2022, I applied for the position of Manager of Workplace Learning and Development. This position involved notifying the availability of trainings offered by the

7

Workplace Learning and Development department to faculty and professional staff, assisting with the creation of professional trainings to enhance workplace skills, and managing the day-to-day operations of the Office. My management skills were acquired from my undergraduate and graduate school programs, my volunteer experience as a Town Planning Advisor in Chipata District, Zambia and that of Environmental Justice Coordinator in New Orleans, Louisiana. Each of these positions required me to be task-oriented, to be able to address and to respond to changing needs, and to multi-task. I also founded an urban planning consulting and research institute, my sole proprietor business, which required me to understand how to manage all aspects of the various proposed projects outlined in the Requests for Proposals (RFPs). In addition to management, I have experience with creating and delivering trainings in permaculture (the pre-emptive framework) to farmers around Chipata District and community surveying techniques to the urban and social planning staff at Chipata Municipal Council. I have also given presentations to other audiences. These public speaking skills enhance the responsibilities of managers. After graduating from Defendant University in 1992, I traveled to Japan through the Japan Exchange and Teaching (J.E.T) program, where I taught for three years at Soka High School in Soka City, Saitama Prefecture. Whilst I was completing my masterate thesis at Goddard College, I developed a professional community planning certificate curriculum, which I had submitted to a governing body in Vermont for accreditation review, as well as a "Cities and Environment" college-level syllabus. The training, curriculum development, and the syllabus are evidence of my ability to organize and manage information. Most importantly, they give me experience in the delivery of information to working adults.

On March 9, 2022, I applied for the Auxiliary Enterprises Human Resources Assistant Director position. This entailed providing administrative support for employees of the Department

of Auxiliary, including Physical Plant, Dining Services, and Residential Services. As an employee who has been employed under Auxiliary in both Dining Services and Physical Plant (as a painter in Summer 2018 and as a groundskeeper in Summers 2022, 2023, 2024, and 2025), I am able to understand not only systems operations, due to my having completed an urban and regional planning graduate degree, but most, importantly, am also able to comprehend laws and regulations due to my having completed a legislative practicum, having majored in political science, and having taken two law courses ("Civil Liberties" and "International Law") whilst completing my course requirements for the political science major. This position also entails knowledge of health and wage benefits, wage levels, the step systems for each Auxiliary position, and the ability to problem-solve workplace-related concerns. My urban planning training endowed me with the ability to comprehend complex adaptive systems. Human Resources is one such system.

On or about April 11, 2024, I submitted the description of my qualifications and skills, as they pertained to each of the foregoing positions under the title, "Addendum to Employment Discrimination Complaint against University of Massachusetts at Amherst," to the Massachusetts E.E.O.C. (Please refer to Appendix II, pp. 028-030).

The decision by Defendant University to not hire me for any of the seven positions named above was nested in a pattern of discriminatory behavior that Defendant University has exhibited towards me since August 2017, when I attended a career fair at the One Stop Career Center in Northampton, Massachusetts. An employee of the One Stop Career Center informed me that UMass-Amherst would be one of the employers attending and that I should come in and apply for one of their career positions. However, instead of discussing the open opportunities and successfully applying for one of the available career positions, the representative for Defendant University in attendance, whose name was Ms. Heather Anderson, dissuaded me from doing so.

9

Instead of discussing with me the positions available at that time, she returned my resume to me and suggested that I attend the job fair that was scheduled for later in the same week at the Defendant University Campus Center. I did not understand why she suggested this job fair to me as an alternative, but I did as she suggested since she gave no indication that she wished to continue the conversation with me.

Since that incident, I have been employed at Defendant University, first as a "Departmental Assistant," albeit performing the tasks of an entry-level Dietary Worker I at the starting wage of $12.00 per hour. Due to persistently being "not selected for hire," I began researching the positions and wages of individuals whom, I knew, are currently or were previously employed at Defendant University, including Ms. Anderson. The individuals were Melanie DaSilva, Eric Beal, Marc Morrissette, Paul MacGregor, Melissa Zawadzaki, Joyce Sadoski, Emily Boudreau, and others. I utilized the website *http://www.openpayrolls.com* to obtain information about the selected individuals. I compiled and entered the names, degrees (if known), positions, and wages of the selected current and past employees into a table in order to demonstrate where there was disparate treatment and disparate impact. (Please refer to Appendix I, pp. 037-044). Recently, I noticed another employee, Jessica Sadowski, a white woman who works in the Office of the Provost. Ms. Sadowski, who is also an alumnus of Defendant University for having graduated with a B.S. in Hospitality and Tourism Management, began her career at Defendant University at the College of Natural Sciences and Mathematics. (See Appendix I, p. 397). However, unlike I, she was <u>NOT</u> pushed into a low-skilled job before being promoted to a clerk position.

The disparate treatment was obvious in two ways in the case of most of the individuals named in Comparator Tables I & II and in the case of Ms. Jessica Sadowski: (1) in the starting position and (2) in the starting wage in relation to degree(s) conferred or training acquired. Comparator

Tables I & II very clearly show the prejudicial view of Defendant University in the assumption that some of the White employees, including the biracial, current or former employee, Ms. Heather Anderson, who possessed the same or lower qualifications and experiences, were capable of performing the duties and tasks of their respective positions, but that I was not, despite my education and professional experiences.

The disparate treatment is also evident in Mr. Jeremy Forgue's response to my allegations, delivered in a written document (the Position Statement) dated May 17, 2024. This information is included on the record at the Massachusetts E.E.O.C office. Mr. Forgue attested to his assumption that I was not qualified for the positions on which my E.E.O.C complaint was based because, to summarize, my experiences were "insufficient" compared to those hired for the positions challenged in this Complaint:

> "Complainant did not meet the minimum qualifications as detailed in her application materials, compared to the Minimum Qualifications required in the job posting (Attachment B Senior Survey and Evaluation Analyst Application Materials; and Attachment C Job Posting #520356). Specifically, Complainant had insufficient experience in survey design, implementation, and analysis and did not possess a master's degree in a related field ".

He further argued that I was not as qualified as those who had been hired for each position:

> "Respondent agrees that Complainant was not selected for consideration in the hiring process for Academic Advisor in Graduate & Professional Programs in the Isenberg School of Business. Complainant did meet minimum qualifications (Attachment F Academic Advisor Application Materials; and Attachment G Job Posting #520396). However, another candidate was selected who had more relevant work experience, including six years of human resources experience. "

However, apart from noting that I did not have six years of human resource experience, he did not clarify which other attributes were possessed by those who had been hired, albeit which I did not have. (See Appendix II, pp. 037-042, for entire Position Statement). Furthermore, Mr. Forgue did not include any evidence supporting his claim that the candidates hired for the positions

11

challenged in this Complaint were stronger. (See also Appendix I, pp. 055-097, for my masterate and undergraduate qualifications and work experiences. My resume includes my Linkedin.com professional profile, which is listed on the header of my resume). If one reviewed the educational level and qualifications on the job description for at least two of these positions ("Academic Advisor – Graduate and Professional Programs" and "Senior Survey Evaluation Analyst"), one could see that I possess some required for thereof. (App. II, pp. 061-072). Unfortunately, I managed to save only two of the job descriptions.

In addition, Mr. Forgue insisted that PSU candidates, due to the Seniority clause in the PSU Collective Bargaining Agreement, were immune from the enforcement of Equal Employment Opportunity mandates due to the PSU Collective Bargaining Agreement (Please refer to Appendix II, p. 041, "union contractual obligations"). In my Appellant Brief, responding to the Position Statement of Mr. Forgue for Defendant University, I pointed out that the seniority clause has been applied arbitrarily in relation to its previous practices with respect to, for examples, current and/or former employees, Melanie DeSilva, Eric Beal, and Heather Anderson. None of these three individuals had worked at Defendant University for six years before being hired for their respective positions. (See Appendix I, pp. 195-197; pp. 187-194; pp. 163-186, respectively). As such, the seniority reason with respect to the PSU Collective Bargaining Agreement was likely a pretext to Defendant University's true reason for not hiring me, which is discrimination. As I had argued in my Appellant Brief:

> "With respect to its hiring practices, the repeated exceptions demonstrated
> by the Respondent in its enforcement of the Seniority status clause, in respect
> of the foregoing named individuals, shows that the Respondent not only enforces
> the Seniority clause arbitrarily, but further demonstrates that this has been a
> pattern. Thus, although not apparent in the language, the decision to not hire the
> Complainant, due to her lack of seniority compared to the individuals hired
> for the jobs challenged in this charge, was injurious to Complainant when
> examined in the light of the history of low Filipina/o American

12

representation in the academic staff, senior or junior administrative staff, and the student body. Griggs v. Duke Power Co., 401 U.S. 424 (1971), California Brews Assoc. v. Bryant, 444 US 598 (1980). The Civil Rights Act of 1991 should have been considered in the deliberation of the final decision, specifically, the language barring the use of seniority for hiring or promotional purposes if its enforcement injures an employee. Civil Rights Act of 1991, Title I, Federal Civil Rights Remedies, S.1745-102nd Congress (1991-1992), http://www.congress.bill102nd-congress/senate-bill/1745. Hence, the reason of seniority given by the Respondent was likely a pretext for employment discrimination." (See Appellant Brief in Appendix II, p. 017).

Contrary to what he was required to include on the record, Mr. Forgue did not include evidence that substantiated his claims. He did not include material evidence, such as university transcripts, of those hired for the positions challenged in this position, (See Civil Rights Act of 1991, No. 5 under "Standard of Review"), whereas the hiring committee for the positions on which this Complaint is based were in receipt of most of my academic transcripts. (My Goddard College transcript might be missing from those which I had sent through the "Employment" portal, as the portal does not accept files in excess of the specified size). I also included evidence of my leadership experience when I was able to do so (See Appellant Brief in Appendix I, pp. 129, 131). For other professional experiences, I am able to obtain my tax transcripts from the IRS if needed as proof of my other work experiences.

An additional point, which needs to be made on Mr. Forgue's comments about my "insufficient" work experiences, is that People of Color are generally not hired as prolifically as White applicants, even when they (People of Color) possess pertinent and equivalent qualifications and experiences. Anyone who has ever tried employment discrimination legal cases is well aware that for People of Color, gaining vast number of years of employment experience in high-level positions is difficult because the labor market has historically been closed to them. *Griggs v. Duke Power Co., 401 U.S. 424 (1971)*. Historically, individuals of Philippine heritage have been subjected to employment discrimination. Such a pattern is present at Defendant University.

13

Evidence of gross under-representation is evident amongst the academic, executive, and upper-division professional staff at Defendant University, as I had pointed out in my Brief appealing the Massachusetts E.E.O.C's dismissal of my Complaint. (Please refer to Appendix II, pp. 015-016). People of color, historically and presently, are more highly represented at low-skilled positions that do not require a higher education degree.

I would have responded to Mr. Forgue's claims of qualification and experiential insufficiency compared to those individuals hired for the positions challenged in the Complaint had the Massachusetts E.E.O.C given me the twenty-day allowance granted to Complainants, per the E.E.O.C procedural standards ("*E.E.O.C will provide the Respondent's position statement and non-confidential attachments to Charging Parties upon request and provide them with (sic.) an opportunity to respond within 20 days. The Charging Party's response will not be provided to Respondent during the investigation, U.S. Equal Employment Opportunity Commission under "Questions and Answers for Charging Parties on E.E.O.C's New Position Statement Procedures"*). However, **the Massachusetts E.E.O.C made a decision on May 23, 2024**, a mere **six days** after Defendant University **submitted its Position Statement to my Complaint on May 17, 2024**. Subsequently, the state E.E.O.C dismissed my Complaint. (Please refer to date of Position Statement in Appendix II, p. 037 and date of E.E.O.C Disposition Statement, Appendix II, pp. 053-056). Such an action on the part of the state E.E.O.C displayed prejudice and bias towards me, the Complainant.

Thenceforth, pursuant to C.F.R §1614.401(a), on June 20, 2024, I faxed my Notice of Appeal of the Massachusetts E.E.O.C determination (see Appendix II, p. 050-052 for Notice of Appeal, and Appendix II, p. 049 for fax receipt) on the grounds that failing to comply with due process in the E.E.O.C complaint process is an act of insubordination that affected the determination of my

14

Complaint and showed bias and prejudice towards me. Henceforth, on July 16, 2024, I sent my supporting Appellant Brief to the E.E.O.C Federal Appeals Office in Washington D.C., in alignment with the E.E.O.C complaint processing procedures, and one copy to Defendant University. (For evidence of the U.S.P.S receipt and the signature confirmation, please refer to Appendix II, p. 057-060). In my Brief, I highlighted where Defendant University had demonstrated disparate treatment and disparate impact with respect to White employees and with respect to members of protected groups. (Please refer to pp. 015-017 in Appellant Brief, Appendix II, in relation to my state E.E.O.C Complaint pp. 024-033, "Disparate Treatment" and Comparator Tables on pp. 037-041 in Appendix I). Given the past behaviors of Defendant University with respect to the individuals highlighted in the E.E.O.C Complaint, there was no indication that it acted inversely from its previous discriminatory posture in relation to the positions challenged in this Complaint. Mr. Jeremy Forgue as much as demonstrated the willful intention of Defendant University to perpetuate the biased attitude already displayed towards me when he insisted that I did not have sufficient experience, had not met the minimum requirements of the challenged positions, and had little experience in the tasks requested for the positions challenged in the Complaint. I have not applied for an upper-division career position since November 19, 2023, because there have been no jobs advertised that have been as alluring as the positions named in this filing to which I had applied. Moreover, I am not confident that Defendant University will extend the same fairness and equity mandate to me in future job opportunities as it has to the individuals named in the original Complaint for comparison in its past practices.

To date, the E.E.O.C Office of Federal Appeals has yet to acknowledge my Notice of Appeal and to make a determination on my Appeal. Please refer to the E.E.O.C Management Directive, Title 29 CFR §1614.401. The failure to respond implies the prejudicial position that the E.E.O.C

has taken towards me, the Complainant, in regard to this complaint and gives cause to believe that the agency is an accessory to Defendant University's discriminatory behavior towards me.

## III. Relief Sought

As the aggrieved individual, the U.S. Supreme Court grants me "an implied private right of action" under Title IX, *Cannon v. Univ. of Chicago*, 441 U.S. 677, 703 (1979), and Title VII of the Civil Rights Act of 1964 ("Private Right of Action and Individual Relief through Cause of Action"). I am further entitled to actual and punitive relief, pursuant to C.R.A 1991, sec. 102 and Title 42 U.S.C §§1981a(a)(1), 2000ff-6(a)(3). The grounds thereof are:

(1) Defendant University (UMass Amherst) displayed disparate treatment when it refused to give me credit for my professional attributes, inclusive of university qualifications and work experiences, compared to its treatment of the qualifications and experiences of other applicants who had been hired by UMass Amherst. The hiring committee demonstrated this refusal when Respondent, Mr. Jeremy Forgue, insisted that I did not possess the training or experience in research, no higher education experience, not minimally qualified because I did not possess five years of experience, etc. My undergraduate and graduate transcripts, which I included with the cover letters and resumes, indicated the contrary. In the cover letters, I explained how my qualifications and skills set were transferable and applicable to each position. (I am not currently in possession of the submitted cover letters). These actions were the most recent incidents in the patterns of discriminatory behavior that Defendant University has exhibited towards me since August 2017, when I was diverted to the low-skilled job fair from the career fair I had attended at the One Stop Career Center in Northampton, Massachusetts.

(2) The employment discrimination resulted in a job offer (Dietary Worker I), which in 2017 was equivalent to Grade 7, now Grade 8, when one of my graduate qualifications is in fact

16

equivalent to at least Grade 25. At the very least, my Master of Urban and Regional Planning, related experiences notwithstanding, are equivalent to the Grades of the similar disciplines of Architecture and Landscape Architecture. Consequently, my starting and current wages were/are far lower than what they were/are for those individuals named in this Complaint for comparison, who were credited and, thereby, hired for the professional, higher paying positions at UMass Amherst, the Defendant university. (Please refer again to the Comparator Tables I and II in Appendix I, pp. 037-044).

(3) I paid a filing fee of $405.00 so that the U.S. District Court would take this civil action against Defendant University seriously, rather than lightly. This amount is an inconvenient allocation because it simply adds to the co-payments on my medical and dental bills.

(4) To prepare my E.E.O.C complaint and to appeal the decision, I have had to conduct legal research, carefully review the responses of the Defendant University and the E.E.O.C and then collect the material to support my allegations and cross-responses, and write my complaint and appellant brief. The effort and time I expended on researching the law, on reading and understanding how to file with the E.E.O.C and the rules of procedure of the E.E.O.C, and on preparing my complaint and appeal equaled to more than forty hours in total, an investment of time that was probably equivalent to that which an attorney would have expended on a civil lawsuit for a client. I am not financially compensated for this time and effort. I am also not financially compensated for the inconvenience of fighting for my right to be treated fairly and equally. I would prefer to finish my second academic book, but in order to ensure that I am not blacklisted for future job applications at Defendant University, I must fight against the employment discrimination exhibited towards me by Defendant University. Had Defendant University treated me with the

17

same respect and fairness as other similarly situated applicants, I most likely would have been offered one of the positions on which this litigation is based.

Furthermore, the actions of the Massachusetts E.E.O.C and E.E.O.C Federal Appeals Office caused emotional distress when the former did not allow me the conventional twenty days to respond to the Defendant University's claims that I was not qualified, a deprivation of my due process rights that resulted in the Massachusetts E.E.O.C dismissing my case; and when the E.E.O.C Federal Appeals Office did not acknowledge either my Notice of Appeal or my Supporting Brief, it indicated that my rights, in terms of the right to be heard by an impartial body, namely the E.E.O.C, and the right to fair and equal treatment under Title VII, Title IX and the Civil Rights Act of 1991, were insignificant. In both instances, the E.E.O.C showed partiality and politicism, two actions with grave, emotional consequences. There have been studies that demonstrate the effects of discrimination on emotional and psychological health. An example of such a study is Chen and Mallory, "The Effect of Racial Discrimination on Mental and Physical Health: A Propensity Score Weighting Approach," *Soc Sci Med*. 2021 September 285: 114308. *doi:10.1016/j.socscimed.2021.114308*. This study is merely one of many. In showing bias, both the E.E.O.C state and federal appeals office failed to adhere to its mission statement and duty of care obligation of impartiality and objectivity.

(5) The employment discrimination has resulted in a loss of appropriate wages. Had the employment discrimination not been present, I would have been paid the salary advertised for the positions on which this litigation is based. My current low wage has imposed some hardship, as I am not able to pay a larger amount on my consolidated U.S. Federal loans with AidVantage. The higher salary would have enabled me to allocate a higher monthly amount towards my U.S. Federal Student Loans. Presently, I am barely able to pay more than the full monthly interest.

Consequently, the balance of more than $283,000.00 on my federal student loans is increasing, rather than decreasing. I am also not able to rent an apartment or mortgage a house. In light of the volatile and dysfunctional dynamics in my family, moving into a residence of my own would be wise and healthy for me. However, my low wage does not allow me to pay for the monthly rent. As such, at the age of 56, I am forced to endure the unhealthy family dynamics.

I have broken down the monetary compensation for the Constitutional violations, the filing fee for the U.S. District Court of Massachusetts, the emotional distress, the inconvenience, the time taken for legal and administrative research, compiling documents, writing this civil complaint, and for the wages lost as a result of the employment discrimination in the following way:

- $40,000 for violating Title VII and Civil Rights Act of 1991 (punitive damages);

- $80,000 - $125,000 for the salary I would have earned had it not been for the sexual, racial, and ethnic origin discrimination (actual damages);

- $405.00 for the U.S. District Court filing fee (actual damages);

- $40,000.00 for emotional anguish and for the time taken to research allowable grounds for and the preparation of documents for complaint with E.E.O.C and litigation in U.S. District Court for Massachusetts (actual damages).

## IV.  Certification and Closing

Under Federal Rules of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information and belief that this complaint: (1) is not being presented for an improper purpose, such as to, harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so

19

identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Under protection of 28 U.S.C § 1654, I am proceeding *pro se* without assistance of Counsel. I am, thus, entitled to an earnest examination of the merit of my civil action.

I have electronically and manually signed this document.

Date of signing: <u>January 22, 2026</u>

Signature of Plaintiff: <u>*Camille Tuason Mata*</u> , *pro se.*

Printed Name of Plaintiff: <u>Camille Tuason Mata</u>
184 Plumtree Road
Sunderland, MA. 01375
Email: cmata@umass.edu
Mobile: (413) 259-7323